**Matthew T. MONROE, M.D., Plaintiff,**

v.

**AMI HOSPITALS OF TEXAS, INC.
d/b/a AMA Park Plaza Hospital,
et al., Defendants.**

**Civ. A. No. H–93–620.**

United States District Court,
S.D. Texas,
Houston Division.

Oct. 31, 1994.

1024

Kenneth David Hughes, Glickman & Barnett, Julius Glickman, Glickman & Barnett, David H. Burrow, Burrow Countiss & Ray, Houston, TX, for Matthew T. Monroe.

Daniel M. McClure, Fulbright & Jaworski, James W. Rice, James W. Rice & Assoc., Houston, TX, for AMI Hospitals of Texas, Inc., AMI Park Plaza Hosp., Park Plaza Hosp., American Medical Intern. Inc., Lifemark Hospitals of Texas Inc., AMI Park Plaza Hosp. Medical Staff, Executive Committee of the Medical Staff of AMI Park Plaza Hosp., Internal Medicine Section Chiefs of AMI Park Plaza Hosp., Internal Medicine Dept. of AMI Park Plaza Hosp., Dept. of AMI Park Plaza Hosp., Credentials Committee of AMI Park Plaza Hosp. Medical Staff, Bylaws Committee of AMI Park Plaza Hosp., Hosp. Medical Staff, Paul Crafts, Lex Gunn, AMI Park Plaza, Byron Bohnn, Cecil Christensen, Faber McMullen, H. Keith Stonecipher, John M. Lewis, Thane Sponsel.

## MEMORANDUM AND ORDER

ROSENTHAL, District Judge.

Pending before this court is defendants' motion for summary judgment (Docket Entry No. 24). Based on the facts, the applicable law, and the parties' submissions, this court GRANTS defendants' motion.

### I. Background

Plaintiff Matthew Monroe, M.D. ("Monroe") is a cardiologist who worked at Park Plaza Hospital. In May 1992, he resigned after a peer review process that had begun in 1989 led to a recommendation that his hospital staff privileges be revoked. Dr. Monroe filed suit against the Park Plaza Hospital and doctors involved in the peer review process. The suit currently names as defendants AMI Hospitals of Texas, Inc., D/B/A AMI Park Plaza Hospital (the "Hospital"); Keith Stonecipher, M.D. ("Stonecipher"); Cecil Christensen, M.D. ("Christensen"); and Faber McMullen, M.D. ("McMullen").

Drs. Stonecipher and McMullen are cardiologists in private practice who also practice at Park Plaza Hospital. They are members of medical staff committees at Park

Plaza Hospital that reviewed the medical care given by Dr. Monroe. Dr. Christensen is an orthopedist in private practice who is also affiliated with Park Plaza Hospital and serves as a member of the Medical Staff Executive Committee.

The Hospital medical staff committees considered Dr. Monroe's competence, based on a review of his patient charts, and made recommendations for corrective actions. In 1990, the Medical Staff Executive Committee of Park Plaza Hospital recommended revocation of Dr. Monroe's staff privileges. Before the conclusion of the peer review process and before any final hospital action to revoke his staff privileges, Dr. Monroe voluntarily resigned his hospital staff privileges in May 1992.

Dr. Monroe's state law claims against the defendants include claims for fraud, tortious interference, libel and slander, infliction of emotional distress, conspiracy, constructive discharge, and breach of confidence. Dr. Monroe alleges that Drs. Stonecipher and McMullen wrongfully caused the peer review investigation into Dr. Monroe's competence, either negligently, or with knowledge that the basis was false or with reckless disregard for the truth. Dr. Monroe alleges that such actions also violated the Park Plaza Medical Staff Bylaws. Dr. Monroe also claims that the defendants breached their duty to keep peer review matters confidential by disclosing them to Dr. Monroe's colleagues, other physicians, patients, and the public.

In addition, Dr. Monroe claims that he was deprived of his due process rights to proper notice and an opportunity to be heard. Dr. Monroe also alleges violations of antitrust and restraint of trade laws.

The defendant Hospital and Drs. Stonecipher, McMullen, and Christensen seek summary judgment as to each claim against them.[1]

## II. Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a

matter of law. Fed.R.Civ.P. 56(c). A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Under Fed.R.Civ.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir.1987).

If the moving party has met its Rule 56(c) burden, the nonmovant must come forward with " 'specific facts showing that there is a *genuine issue for trial.*' " *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)) (emphasis in original); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Leonard*, 828 F.2d at 294. In deciding a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. If reasonable minds can differ regarding a genuine issue of material fact, summary judgment should not be granted. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511.

## III. Immunity Under Federal Law for Peer Review Actions

■■■ The Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11101 *et seq.*, limits the availability of damages for professional review actions. Hospitals and persons participating in professional review activities that meet the standards imposed by 42 U.S.C. § 11112 "shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action." 42 U.S.C. § 11111(a).

---

1. Plaintiff also sued, then settled with, Dr. John Lewis, who served as the external reviewer for the Executive Committee's peer review of Dr. Monroe.

The HCQIA creates a rebuttable presumption of immunity, as follows:

A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in Section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C. § 11112(a). This rebuttable presumption creates an "unusual" summary judgment standard: " 'whether [the plaintiff] provided sufficient evidence to permit a jury to find that he ha[d] overcome, by a preponderance of the evidence, the presumption that [the Hospital] would reasonably have believed' that it had met the standards of section 11112(a)." *Bryan v. Holmes Regional Medical Center*, 33 F.3d 1318, 1333–34 (11th Cir.1994) (quoting *Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir.1992)). HCQIA immunity is a question of law for the court to decide. *Id.* at 1331–32.

## A. The Application of HCQIA

This court first notes that the actions and parties at issue here fall within HCQIA. The challenged action is the Medical Staff Executive Committee's recommendation to revoke Dr. Monroe's staff privileges. HCQIA defines "professional review action" as follows:

[A]n action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges . . . of the physician.

42 U.S.C. § 11151(9). The entities protected under HCQIA include:

(A) the professional review body,

(B) any person acting as a member or staff to the body,

(C) any person under a contract or other formal agreement with the body, and

(D) any person who participates with or assists the body with respect to the action. . . .

42 U.S.C. § 11111(a)(1).

It is undisputed that the hospital, Dr. Stonecipher, Dr. McMullen, and Dr. Christensen fall within these protected categories. Dr. Monroe claims, however, that two instances of conduct are outside the peer review process and are not within the immunity provided by the HCQIA: (1) a discussion by Dr. McMullen of some of Dr. Monroe's medical cases at a Park Plaza Hospital Internal Medicine department meeting in June 1990; and (2) two statements by Dr. Christensen to Dr. Monroe's patients that his care was substandard.

■ The discussion of Dr. Monroe's cases at an Internal Medicine department meeting falls within the definition of immunized professional review activity. By discussing Dr. Monroe's cases, Dr. McMullen was participating in the peer review process that the statute protects.[2] Drs. Stonecipher and McMullen are entitled to immunity for this and other actions relating to the peer review of Dr. Monroe, provided that the peer review process met the standards set forth in § 11112(a).

■ The statements allegedly made by Dr. Christensen do not appear to have been made in furtherance of the peer review process. However, the evidence of Dr. Christensen's statements is inadmissible hearsay. Dr. Monroe stated in his affidavit and during his deposition that two of his patients, Mr. George Pappas and Ms. Rosey Butler, had each told him that Dr. Christensen had told them that he did not want Dr. Monroe to provide cardiac consultation for Mrs. Pappas or Ms. Butler. Dr. Monroe was not present during, nor did he overhear, either of the alleged statements by Dr. Christensen. The

---

**2.** Among the congressional findings that prompted the passage of this legislation are that "[t]he threat of private money damage liability under Federal laws . . . unreasonably discourages physicians from participating in effective professional peer review . . . [and] [t]here is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review." 42 U.S.C. § 11101.

statements constitute inadmissible hearsay[3] and cannot support the claim against a motion for summary judgment.

## B. The Four Standards Under HCQIA § 11112(a)

The standards that professional review actions must satisfy to entitle the participants to protection under 42 U.S.C. § 11111(a) are set out in 42 U.S.C. § 11112(a). The standards require that the professional review action be taken:

(1) in the reasonable belief that the action was in furtherance of quality health care,

(2) after reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a). HCQIA creates a rebuttable presumption that professional review actions meet these standards. *Id.*

Dr. Monroe does not directly dispute that the peer review process met the standards under sections 11112(a)(1), (2), and (4). This court finds that Dr. Monroe has not met his burden to provide summary judgment evidence to overcome, by a preponderance of the evidence, the presumption that the peer review action met the standards under section 11112(a)(1), (2), and (4) of the HCQIA.

[5] The first prong of the HCQIA immunity test, section 11112(a)(1), is that "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." H.R.Rep.

No. 903, at 10, *reprinted in 1986 U.S.C.C.A.N.* at 6393, *quoted in Bryan v. Holmes Regional Medical Center,* 33 F.3d 1318, 1334–35 (11th Cir.1994). There is ample evidence in the summary judgment record that the peer review investigation and resulting recommendation were prompted by the reasonable belief that doing so would promote quality health care. There is also ample evidence that the defendants made a reasonable effort to obtain facts relating to Dr. Monroe's patient care and took action in the reasonable belief that the action was warranted by the facts known, thus meeting the second and fourth prongs of the HCQIA test.

The record shows that concerns about Dr. Monroe's professional competence and judgment in providing patient care were the impetus for the peer review and the resulting adverse recommendation. Some of Dr. Monroe's patients' charts had been flagged for further review by a hospital quality assurance program, the Patient Care Assessment Program ("PCAP"). The PCAP does ongoing peer review of patient medical charts. (Savoy Aff. at 4, 8). Other charts were reviewed as part of a 1988 Pacemaker Insertion Study.

Charts of Dr. Monroe's patients flagged through hospital quality assurance programs or through the 1988 Permanent Pacemaker Insertion Study were reviewed first by the Cardiology Section of the Internal Medicine Department (the "Cath Conference"), then referred to the Internal Medicine Section Chiefs ("IM Section Chiefs"). For example, in the case of Patient # 3006522, the Cath Conference reviewed a chart initially flagged by PCAP personnel for lack of full documentation of indications for pacemaker insertion and referred it to the IM Section Chiefs. The IM Section Chiefs requested that Dr. Monroe attend a later meeting and present his case in person. The IM Section Chiefs reviewed additional documentation of indications for pacemaker insertion provided by

---

**3.** Dr. Monroe's counsel asserts that the statements by Dr. Christensen are operative facts and thus not hearsay. Even if Dr. Christensen's statements themselves are not hearsay because they are not offered to prove the truth of the matter, but rather to prove that the statements were said, because Dr. Monroe is the only in-court declarant, the statements of Mr. Pappas and Ms. Butler reporting what was said do constitute hearsay.

the surgeon, then referred the case to the Medical Staff Executive Committee. Dr. Leachman, an outside evaluator engaged by the Executive Committee, expressed concern about the lack of indications in the record for pacemaker insertion. Dr. Leachman also confirmed the adequacy of the Hospital's pre-established screening criteria for pacemaker insertion. Dr. Monroe was informed of these determinations.

At its August 31, 1989 meeting, the Executive Committee voted unanimously to conduct a three-month review of all admissions and consultations by Dr. Monroe during the period of May, June, and July 1989. The Executive Committee then engaged an outside independent consultant to review those cases that were part of the focused three-month review. Some cases flagged during the routine PCAP program or the 1988 Permanent Pacemaker Insertion Study for varying from quality assurance norms were also sent to the outside reviewer.

The outside evaluator reviewed seven cases. His comments were referred by the Executive Committee to the Internal Medicine Section Chiefs, who reviewed them at their May 24, 1990 meeting and concluded that substandard care had been rendered by Dr. Monroe in the seven cases. All seven cases were then referred by the IM Section Chiefs to the Internal Medicine Department with a request for corrective action. At its June 6, 1990 meeting, the Internal Medicine Department resolved unanimously that the IM Section Chiefs' recommendation be followed. The Internal Medicine Department then forwarded its resolution and recommendation to the Executive Committee. At its June 28, 1990 meeting, the Executive Committee unanimously resolved to recommend revocation of Dr. Monroe's staff membership and clinical privileges.

Dr. Monroe has failed to overcome the presumption that the peer review action in this case was taken in the reasonable belief that it would further quality health care, under section 11112(a)(1). There is also insufficient evidence to overcome the presumption that the defendants took action "after a reasonable effort to obtain the facts of the matter" and that the action was taken "in the reasonable belief that the action was warranted by the facts known," in accordance with sections 11112(a)(2) and (4). Dr. Monroe disagrees with the defendants' judgment concerning the propriety of his medical decisions. However, "[t]he role of the federal courts 'on review of such actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges.'" *Bryan*, 33 F.3d at 1337 (quoting *Shahawy v. Harrison*, 875 F.2d 1529, 1533 (11th Cir.1989)).

■■■ Dr. Monroe asserts that Drs. Stonecipher and McMullen wrongfully instigated the peer review process because they were his competitors. Dr. Monroe also claims that HCQIA is inapplicable because the defendants "engaged in a conspiracy designed to destroy Dr. Monroe's practice and reputation" and that such a conspiracy is actionable under the Sherman Act. (Pl.'s Response to Defs.' Mot. for Summ.J. at 2, 4).[4] However, provided that the defendants' actions meet the standards under section 11112(a), HCQIA immunity applies to these claims as well. *See Austin v. McNamara*, 979 F.2d 728, 733 (9th Cir.1992) ("[HCQIA] excludes from its coverage suits brought under 42 U.S.C. § 1983 or Title VII ... but it clearly does apply to antitrust claims"). Assertions of hostility or bad faith are immaterial to the reasonableness standards of § 11112(a). *Austin*, 979 F.2d at 734; *Bryan*, 33 F.3d at 1335–36; *see also Smith v. Ricks*, 31 F.3d 1478, 1485 (9th Cir.1994) (doctor who alleged "vague conspiracy by an 'in-group' of doctors out to get him" did not rebut presumption). "The real issue is the sufficiency of the basis for the [defendants'] actions." *Bryan*, 33 F.3d at 1335, (quoting *Austin*, 979 F.2d at 734). Because this court finds that Dr. Monroe's allegations are insufficient to overcome the presumption that the defendants' actions met the standards under section 11112(a),

4. Dr. Monroe argues that "[t]his case is not about the wrongful termination of staff privileges. Instead, this case concerns Defendants' tortious conduct that was designed to destroy Dr. Monroe's professional reputation and practice." (Pl.'s Response to Defs.' Mot. for Summ. J. at 2).

HCQIA immunity protects defendants from Dr. Monroe's antitrust and conspiracy claims.

■ Dr. Monroe claims that defendants are precluded from immunity under HCQIA because they failed to provide Dr. Monroe with the notice and hearing required by section 11112(a)(3). (Pl.'s Supplemental Response to Defs.' Mot. for Summ.J., at 21). Under HCQIA, "a professional review action must be taken ... after adequate notice and hearing procedures are afforded to the physician involved" in order to qualify for immunity. 42 U.S.C. § 11112(a)(3). Dr. Monroe claims that the defendants failed to meet the section 11112(a)(3) requirement because he was denied formal notice and a full hearing before the June 28, 1990 recommendation that his staff privileges be revoked. However, the statute does not require such notice and hearing before a peer review committee investigates and makes a recommendation as to clinical privileges.

■ The statute required adequate notice and a hearing before the hospital board of directors acted on the Executive Committee's recommendation to revoke Dr. Monroe's staff privileges.[5] It is undisputed that Dr. Monroe was provided with multiple notice from the various peer review committees that considered his cases. It is also undisputed that Dr. Monroe was provided the opportunity to present his cases at some of these meetings. It is also undisputed that Dr. Monroe's staff privileges were not suspended

or revoked during the course of the peer review.

On June 28, 1990, the Executive Committee made its recommendation to the hospital's board of directors that Dr. Monroe's privileges be revoked. The committee then provided Dr. Monroe with notice of this decision and of his rights to a hearing before the Judicial Review Committee by letter dated July 3, 1990. Following Dr. Monroe's request for a hearing, the Executive Committee, by letter dated August 24, 1990, gave Dr. Monroe a written statement of the grounds for its recommendation.

Dr. Monroe thereafter retained counsel. After discovery, several postponements of the hearing, and the replacement of two members of the hearing panel challenged by Dr. Monroe for cause, a hearing began on March 19, 1991. After Dr. Monroe's challenge, one member of the hearing panel was disqualified and removed. Dr. Monroe objected to proceeding with only four panel members, and Judge Peden, the presiding officer, suspended the hearing. At a motions hearing on May 8, 1992, the presiding officer denied Dr. Monroe's motion to dismiss the recommendation to revoke his medical staff membership and hospital privileges. (See Savoy Aff. at 21). On May 11, 1992, Dr. Monroe resigned his membership and privileges at Park Plaza Hospital.[6]

Section 11112(b) sets forth the "safe harbor" conditions that a health care entity may meet to fulfill the requirement of adequate notice and hearing.[7] However, section

---

5. This court does not reach the question of whether under the medical staff bylaws, Dr. Monroe should have received written notice prior to the June 28, 1990 meeting of the Executive Committee. This court notes, however, that under Texas law, a hospital's medical staff bylaws do not constitute a contract between a hospital and its medical staff members. *Weary v. Baylor Univ. Hosp.*, 360 S.W.2d 895, 897 (Tex.App.— Waco 1962, writ ref'd n.r.e.).

6. Dr. Monroe states in his affidavit that "the hearing judge dismissed the hearing and Defendants' peer review stating that Defendants had violated the bylaws and the rules regarding peer review." (Monroe Aff. at 2). Judge Peden's affidavit, on the other hand, states that he did not rule that the lack of notice before the June 6, 1990 meeting of the Exec. Committee (when they decided to recommend revocation) violated medical staff bylaws. According to Judge Peden, at

the motions hearing, he told the Hospital's attorney to make sure that Dr. Monroe's due process rights had been satisfied before going forward with the judicial review committee hearing, but he "did not 'dismiss' the peer review proceedings against Dr. Monroe and cancel the judicial review committee hearing." (Peden Aff. at 3).

7. Section 11112(b) provides as follows:
(b) **Adequate notice and hearing**
 A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):
 (1) **Notice of proposed action**
 The physician has been given notice stating—
 (A)(i) that a professional review action has been proposed to be taken against the physician,

11112(b) specifically provides that the failure of a review body to meet the enumerated conditions does not constitute a failure to meet the standards of section 11112(a)(3). Indeed, "[i]f other procedures are followed, but are not precisely of the character spelled out in [section 11112(b) ], the test of 'adequacy' may still be met under other prevailing law." H.R.Rep. No. 903, at 10, *reprinted in* 1986 U.S.C.C.A.N. at 6393. Section 11112(b) explicitly provides that compliance with its terms is not required if the physician voluntarily waives them. On the record of this case, this court finds that no reasonable jury could conclude that the defendants had not afforded Dr. Monroe adequate notice and hearing. Dr. Monroe has not shown sufficient evidence for a reasonable jury to conclude that the defendants did not afford Dr. Monroe due process prior to his resignation.

## IV. Immunity Under State Law for Peer Review Actions

Dr. Monroe also claims that because the defendants acted with malice, they are not entitled to immunity under Texas law. The Texas Medical Practice Act ("TMPA") provides:

> (ii) reasons for the proposed action,
> (B)(i) that the physician has the right to request a hearing on the proposed action,
> (ii) any time limit (of not less than 30 days) within which to request such a hearing, and
> (C) a summary of the rights in the hearing under paragraph (3).
> **(2) Notice of hearing**
> If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating—
> (A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and
> (B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.
> **(3) Conduct of hearing and notice**
> If a hearing is requested on a timely basis under paragraph (1)(b)—
> (A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)—
> (i) before an arbitrator mutually acceptable to the physician and the health care entity,
> (ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or
> (iii) before a panel of individuals who are appointed by the entity and are not in direct

(*l* ) A cause of action does not accrue against the members, agents, or employees of a medical peer review committee or against the health-care entity from any act, statement, determination or recommendation made, or act reported, without malice, in the course of peer review as defined by this Act.

(m) A person, health-care entity, or medical peer review committee, that, *without malice,* participates in medical peer review activity or furnishes records, information, or assistance to a medical peer review committee or the board is immune from any civil liability arising from such an act.

TEX.REV.CIV.STAT.ANN. art. 4495b § 5.06 (Vernon 1994) (emphasis added).

 Under Texas law, a presumption of absence of malice applies to medical peer review committee actions. *Maewal v. Adventist Health Systems,* 868 S.W.2d 886, 893 (Tex.App.—Fort Worth 1993, writ denied). "Malice" as used in article 4495b means "knowledge that an allegation is false or with reckless disregard for whether the allegation is false." *Id.* at 893.

> economic competition with the physician involved;
> (B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;
> (C) in the hearing the physician involved has the right—
> (i) to representation by an attorney or other person of the physician's choice,
> (ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,
> (iii) to call, examine, and cross-examine witnesses,
> (iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and
> (v) to submit a written statement at the close of the hearing; and
> (D) upon completion of the hearing, the physician involved has the right—
> (i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and
> (ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.
> 42 U.S.C. § 11112(b).

As under HCQIA, under Texas law, the nonmovant has a higher burden than under normal summary judgment standards to defeat a summary judgment motion. Because there is a presumption of absence of malice, the plaintiff must show sufficient and specific evidence of malice. Dr. Monroe ascribes falsity to statements because he disagrees with the medical opinions and judgments on which they are based. He provides no evidence of knowledge of falsity or of reckless disregard for the truth.[8] After a detailed review of the summary judgment evidence, this court finds no disputed issue of fact material to defendants' immunity under the Texas statute.

## V. The Hospital's Report to the Texas Board of Medical Examiners

Both federal and state statutes require hospitals to report the results of peer review actions. 42 U.S.C. § 11133; Tex.Rev. Civ.Stat.Ann. art. 4495b, § 5.06(b) (Vernon 1994). Persons and entities who report information regarding peer review are immune under HCQIA if they provide the information without knowledge of its falsity, 42 U.S.C. § 11137(c), and are immune under the TMPA if they provide the information without malice, Tex.Rev.Civ.Stat. art. 4495b, § 5.06(m).

Dr. Monroe claims that because the statements made during peer review were false, the reporting of the adverse recommendation was also false and not immune. (Pl.'s Supplemental Resp. to Defs.' Mot. for Summ. J. at 25.) Dr. Monroe also claims that because the defendants reported that he resigned "prior to the resolution of certain procedural issues," after the hearing was "dismissed" by the presiding judge, that the report is false.

Dr. Monroe does not provide evidence of malice or falsity. Instead, his claims raise disagreements as to the medical judgments underlying the adverse recommendation. Such disagreements do not constitute evidence of malice or knowledge of falsity. Although Dr. Monroe also disagrees as to the characterization of the outcome of the hearing over which Judge Peden presided on May 8, 1992, he does not dispute that he resigned following the adverse recommendation. This court finds that reporting the outcome of the peer review was required by statute and is within the statutory immunity.

## VI. Due Process Claim

Monroe also states a claim under 42 U.S.C. § 1983 for a violation of his constitutionally protected due process rights. Because there is no evidence of state action, this court grants defendants' motion for summary judgment on this claim.

## VII. Conclusion

This court GRANTS defendants' motion for summary judgment as to all claims. This case is DISMISSED. All other pending motions are DENIED as moot.

---

8. Dr. Monroe points to a disagreement over whether there was inadequate documentation for pacemaker insertion on one patient. The minutes of the Internal Medicine Section Chiefs indicate that Dr. Stonecipher presented this case and that "[d]iscussion ensued regarding no indication for pacemaker insertion." (Pl.'s Supplemental Resp. to Defs.' Mot. for Summ. J., Exh. 2, at 2). The minutes reflect a unanimous recommendation that Dr. Monroe be invited "to attend the October meeting and bring his office records to document indications for the pacemaker insertion." *Id.* This evidence is insufficient to overcome a presumption of absence of malice, because it merely records a medical disagreement over a case presented during the process of peer review.