*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MICHAEL D. BRANDNER, M.D., | ) | |
| | ) | Supreme Court No. S-15933 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-07697 CI |
| v. | ) | |
| | ) | OPINION ON REHEARING |
| PROVIDENCE HEALTH & | ) | |
| SERVICES — WASHINGTON, | ) | No. 7172 – May 19, 2017 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Patrick J. McKay, Judge.

Appearances: Richard W. Maki and David H. Shoup, Tindall Bennett & Shoup, P.C., Anchorage, for Appellant. Robert J. Dickson and Peter A. Scully, Atkinson, Conway & Gagnon, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree and Bolger, Justices. [Fabe and Maassen, Justices, not participating.]

WINFREE, Justice.

I.     INTRODUCTION

Providence Alaska Medical Center terminated Dr. Michael Brandner's hospital privileges without an opportunity to be heard after determining he had violated hospital policy by failing to report an Alaska State Medical Board order requiring him to undergo an evaluation of his fitness to practice medicine. Dr. Brandner unsuccessfully

challenged this action through Providence's internal post-termination hearing and appeal procedures. Dr. Brandner then sued in superior court, seeking reinstatement and damages for, in relevant part, alleged due process violations both in the procedures used and in the substantive standard applied in his termination. The superior court ruled that Dr. Brandner's due process rights were not violated, that he was not entitled to reinstatement, and that under federal law Providence was entitled to immunity from his damages claims.

We affirm the superior court's decision concerning the substantive standard applied to terminate Dr. Brander; he therefore is not entitled to reinstatement or post-termination-hearing damages. But Dr. Brandner's due process rights were violated by the procedures Providence employed because he was not given any opportunity to be heard prior to the termination of his hospital privileges; we therefore reverse the superior court's decision on the pre-termination hearing claim and its decision that Providence had damages immunity from this claim, and we remand for further proceedings.

## II. FACTS AND PROCEEDINGS

### A. Facts

Dr. Brandner had hospital privileges as a surgeon at Providence from 1995 to 2009, when he took a medical leave of absence because of a cardiac condition. He returned to work in March 2010 and Providence reinstated his hospital privileges, excepting hand surgery. Providence also gave Dr. Brandner a six-month exemption from emergency call duties. In November 2010 Providence reinstated Dr. Brandner's hand surgery privileges after reviewing his surgical cases and finding him competent, but kept in place the emergency call exemption.

In October 2010 the Alaska State Medical Board (State Board) ordered Dr. Brandner to undergo psychiatric and medical evaluations after receiving a complaint that he had contacted someone in the Governor's office and made a threat involving a

gun. The evaluations were part of the State Board's investigation into Dr. Brandner's "ability to practice medicine in a manner consistent with public safety," and he was required to complete them within 45 days. The State Board's order also stated:

> Failure to comply with this order will result in the automatic suspension of [Dr. Brandner's] license to practice medicine in Alaska and it will remain suspended until such time as the evaluations are completed and the results of the evaluations are reviewed by the [State] Board, and the [State] Board determines Dr. Brandner is able to practice medicine in a manner consistent with public safety.

Dr. Brandner timely complied with the order by undergoing a five-day evaluation in early December 2010 at the Menninger Clinic in Texas. The clinic found no evidence indicating he was unfit to practice medicine. Later in December the State Board closed its investigation without imposing any "further investigation or disciplinary action"; it sent Dr. Brandner confirmation of its decision in May 2011.

Doctors enjoying Providence hospital privileges are required to comply with policies set out in the Providence Code of Conduct and Medical Staff Bylaws. Policy MS 980-150(D) requires doctors to report to the chief of staff or the medical staff services department manager "any limitations, restrictions[,] or conditions of any sort imposed by a state board, health care entity[,] or agency with respect to the practitioner's practice . . . no later than thirty (30) days after a final order has been issued." The policy states that doctors who violate this reporting requirement "will be subject to an automatic termination" of hospital privileges. Dr. Brandner did not inform Providence's chief of staff or medical staff services manager about the State Board order, nor did he disclose his December 2010 evaluation at the Menninger Clinic.

Procedures for reviewing, investigating, and resolving concerns about doctors' clinical proficiency and professional conduct are governed by Providence policy MS 980-100, referred to as the Investigation, Hearing, and Appeals Plan (Fair Hearing

Plan). Under this policy the Providence Medical Staff Executive Committee (executive committee) is responsible for overseeing doctors' conduct. Concerns about a doctor's conduct are first presented to the executive committee; it then has authority to conduct peer reviews and make recommendations to the Providence Alaska Community Ministry Board (Providence Board) on granting, limiting, suspending, or terminating hospital privileges. The executive committee's recommendations generally do not by themselves affect a doctor's hospital privileges; the Providence Board receives the recommendation, considers the matter independently, and makes the ultimate decision. Some hospital policies, including the one at issue here, provide for automatic termination of hospital privileges if a doctor engages in specified conduct. An automatic termination recommendation triggers a process under MS 980-100 entitling the doctor to a hearing and an appeal. After the hearing and appeal procedures are exhausted the Providence Board's confirmation, modification, or rejection of the hearing bodies' recommendations becomes Providence's final decision.

In January 2011 the executive committee called Dr. Brandner to its monthly meeting to discuss his emergency call duties. The executive committee was concerned because Dr. Brandner had listed his name on the emergency call sign-up sheets despite not yet being authorized to resume those duties. During that meeting the executive committee was alarmed by Dr. Brandner's "disjointed" statements. The executive committee invited him to a second meeting in February to decide whether to investigate his fitness to practice medicine. At the February meeting Dr. Brandner's "rambling and confused" conduct again raised concerns that he might not be "medically fit," and the executive committee ordered him to undergo a "fitness for duty" evaluation at the Menninger Clinic.

Kim Pakney, Providence's medical staff services manager, called Dr. Brandner in March to arrange the evaluation. During this call Dr. Brandner disclosed

to Pakney that he recently had been evaluated at the clinic. Pakney told Dr. Brandner that he could either undergo another evaluation or allow the executive committee to obtain the December 2010 evaluation records. Dr. Brandner chose to release his 2010 evaluation. According to Pakney's later testimony, Dr. Brandner did not mention the State Board's order during their conversation and instead indicated he had visited the clinic at his cardiac surgeon's suggestion. Dr. Brandner later testified that he told Pakney he had gone to the Menninger Clinic "to pursue some things." Only when Pakney received Dr. Brandner's clinic records did she realize that he had undergone the evaluation pursuant to an order from the State Board. She immediately notified the Providence executive committee.

At its next meeting, on June 13 — without notice to or presence by Dr. Brandner — the executive committee voted to recommend termination of Dr. Brandner's hospital privileges for failure to report the State Board's order requiring him to submit to an evaluation. The executive committee determined that the order was a final order imposing a condition on Dr. Brandner's license, and that his failure to report the order to the chief of staff or the medical staff services department manager within 30 days constituted a violation of Providence policy MS 980-150(D).

In a June 17 letter Providence's chief executive officer notified Dr. Brandner that the executive committee "recommended the automatic termination of [his hospital] privileges and staff membership," that he had the right to a hearing, and that the Providence Board would "not be bound by the adverse recommendation made thus far." A few days later the Providence Board affirmed the executive committee's recommendation terminating Dr. Brandner's hospital privileges. Dr. Brandner timely requested a hearing. At oral argument before us the parties confirmed that as of June 17, before any hearing took place, Dr. Brandner was not allowed to practice at Providence.

## B.    Proceedings

### 1.    Providence Fair Hearing Panel proceedings

In November 2011 Dr. Brandner received a one-day hearing before a three-doctor panel pursuant to Providence's Fair Hearing Plan. A former superior court judge presided as the hearing officer. Dr. Brandner was represented by an attorney, presented evidence, cross-examined Providence's witnesses, and testified on his own behalf. Providence's witnesses testified about the importance of physicians self-reporting conditions on their licenses because of the potential impact on patient care. Dr. Brandner argued that the State Board's order was not a "condition" on his license within the meaning of the Providence reporting policy. He argued instead that the order was a part of an "investigation," and stated that he did not believe the policy required reporting investigations.

The panel decided that the order did impose a "condition" on Dr. Brandner's license because "[t]he plain language of the . . . [o]rder . . . clearly advised Dr. Brandner that the continued viability of his license was conditioned upon his timely completion of [] psychiatric and medical evaluations at the Menninger Clinic." The panel also found Dr. Brandner's testimony regarding his interpretation of the hospital policy "less than credible" because: (1) he testified that he attended the Menninger Clinic to "pursue some things"; (2) Pakney testified that Dr. Brandner said he attended the clinic because his cardiac surgeon had recommended it; and (3) it was undisputed that Dr. Brandner actually attended the clinic because the State Board required it.

The panel concluded that because the State Board order plainly stated Dr. Brandner's license would be suspended if he did not comply, a responsible, reasonable doctor would have reported the order or at least asked Providence for guidance on whether the order triggered Providence's self-reporting policy. It

unanimously upheld the executive committee's June 2011 recommendation and the Providence Board's June 2011 decision terminating Dr. Brandner's hospital privileges, finding that they were "not arbitrary, capricious[,] or unsupported by substantial evidence."

## 2. Providence Appellate Review Committee proceedings

Dr. Brandner timely appealed the panel's decision to the Providence Appellate Review Committee (review committee) pursuant to the Fair Hearing Plan. The review committee, comprised of five members — none of whom had participated in the earlier proceedings — convened in March 2012.

The review committee upheld the hearing panel's decision by a 4-1 vote. In its decision the review committee noted that Dr. Brandner's reading of the hospital policy regarding the scope of "condition" was "plausible" but that the review committee's role was not to substitute its judgment for that of the hearing panel or to re-weigh the evidence. The review committee concluded that the hearing panel's actions complied with Providence's Fair Hearing Plan, were not arbitrary or capricious, and were supported by substantial evidence. It recommended that the Providence Board "confirm" the executive committee's June 2011 recommendation that Dr. Brandner's privileges be terminated. One review committee member dissented, writing that the State Board's order was not a "final order" imposing "conditions" under Providence policy MS 980-150(D) and thus did not trigger the self-reporting requirement. The dissent expressed concern that the hospital policy was applied based in part on Dr. Brandner's fitness to practice and not just his failure to report the State Board order, and it noted that the failure to self-report alone typically would not result in automatic termination of privileges. And after the review committee issued its report, the committee chair sent the Providence Board a letter recommending clarifying MS 980-150(D)'s language by

adding some "interpretive guidance to illustrate the types of limitations, restrictions, and conditions that are intended to be included."

In April 2012, after considering the hearing panel's and the review committee's decisions upholding the executive committee's recommendation, the Providence Board affirmed the termination of Dr. Brandner's hospital privileges.

### 3.    Superior court proceedings

In June 2013 Dr. Brandner filed suit in superior court against Providence, the doctors who made up the hearing panel, and the doctors on the executive committee who testified at his hearing.  Dr. Brandner alleged breach of contract, due process violations, defamation, and other contract claims.  He sought both  declaratory and injunctive relief restoring his hospital privileges and substantial money damages.  Providence and the doctors moved for summary judgment, asserting peer review immunity under both Alaska law[1] and the federal Health Care Quality Improvement Act (HCQIA).[2]  Dr. Brandner opposed and cross-moved for partial summary judgment, arguing that Providence and the doctors were not entitled to immunity under either state or federal law and that his due process rights were violated.  In February 2014 the superior court granted summary judgment in favor of the individual doctors, concluding

---

[1]     *See* AS 18.23.020 (limiting review proceedings participants' liability for damages or other relief if their review actions were not motivated by malice, were taken after reasonable efforts to ascertain the facts, and were taken with the reasonable belief that they were warranted).

[2]     42 U.S.C. §§ 11101-11152 (2012).  Congress passed HCQIA in an effort to "restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance" by encouraging physicians to engage in "effective professional peer review."  42 U.S.C. § 11101.  In pursuit of this aim the HCQIA limits damages on professional review actions.  42 U.S.C. § 11111.

that AS 18.23.020 immunized them from suit.[3]  The court also granted summary judgment in Providence's favor on Dr. Brandner's contract claims.  The court denied Dr. Brandner's cross-motion for summary judgment on his due process claims against Providence.

Dr. Brandner's due process claims were tried without a jury.  The superior court found that Dr. Brandner intentionally misled Providence by consciously hiding the State Board order that he undergo an evaluation, and that his "blatant dishonesty" and "lack of candor" raised substantial patient care issues.  The court also concluded that when a hospital policy requires self-reporting a condition placed on a physician's state license, due process does not require a pre-termination hearing for failure to report in violation of that policy.  Finally, the court concluded that Providence was entitled to immunity under HCQIA.

Dr. Brandner appeals, arguing that:  (1) Providence's termination of his hospital privileges without a pre-termination opportunity to be heard is a due process violation; (2) the post-hearing termination confirmation violated due process because it was based on an ambiguous policy applied arbitrarily and capriciously; and (3) Providence is not entitled to HCQIA immunity from his due process claims. Providence responds that:  (1) the automatic termination of Dr. Brandner's hospital privileges is not a due process violation; (2) its hospital policy is not unduly ambiguous; and (3) under HCQIA it is immune from damages even if Dr. Brandner succeeds in his due process claims.

---

[3]  We later affirmed this decision in *Brandner v. Bateman*,  concluding that "the executive committee and hearing panel reasonably interpreted the policy" and "enforced the sanction explicitly indicated in the policy."  349 P.3d 1068, 1076 (Alaska 2015).

## III. STANDARD OF REVIEW

We review due process claims de novo, "adopting the rule of law most persuasive in light of precedent, reason, and policy."[4] Whether the HCQIA immunizes Providence from Dr. Brandner's due process claims is a question of law that we also review de novo.[5]

## IV. DISCUSSION

### A. Dr. Brandner's Procedural Due Process Rights Were Violated When His Hospital Privileges Were Terminated Without A Pre-Termination Opportunity To Be Heard.

Although the parties dispute what process was due at certain points in the termination process, they agree that Dr. Brandner's admitting privileges trigger some form of due process protection.[6] The specific issue presented involves the due process right to an opportunity to be heard prior to terminating hospital privileges. Although the parties consistently describe this as "pretermination hearing" and we use that language throughout our opinion, we do not mean to suggest that the opportunity to be heard necessarily involves a formal hearing like that set forth in Providence's Fair Hearing Plan and made available to Dr. Brandner after his hospital privileges were terminated. This dispute does not raise the question of what kind of pretermination hearing — more

---

[4] *Alyeska Pipeline Serv. Co. v. State, Dep't of Envtl. Conservation*, 145 P.3d 561, 564 (Alaska 2006).

[5] *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1332 & n.24 (11th Cir. 1994); *see also Maness v. Daily*, 307 P.3d 894, 900 (Alaska 2013) (articulating the de novo standard of review in the federal qualified immunity context).

[6] *See Storrs v. Lutheran Hosps. & Homes Soc'y of Am., Inc.*, 609 P.2d 24, 28 (Alaska 1980) (holding quasi-public hospitals cannot violate due process standards in denying staff privileges).

specifically what kind of opportunity to be heard — must be provided to meet due process concerns.

### 1. Dr. Brandner did not waive his right to a pre-termination opportunity to be heard.

Providence argues that Dr. Brandner waived his right to a pre-termination hearing by agreeing to be bound by MS 980-150, triggering an "automatic termination" without providing for a pre-termination hearing. The right to a pre-termination hearing, Providence argues, may be waived if a sufficient post-termination grievance procedure is afforded.[7] We previously have held that a waiver of constitutional rights must be knowing and voluntary, and even in civil cases "courts must indulge every reasonable presumption against their waiver."[8] And although constitutional rights are subject to contractual waiver, such waiver must be clear.[9] Courts have found clear waiver, for example, in collective bargaining agreements representing "a reciprocal negotiation between forces with strengths on both sides, reflecting the reconciled interests of employer and employees, voluntarily entered into."[10] But here Dr. Brandner had not entered into a reciprocal negotiation with Providence for his hospital privileges; the

---

[7]        *See Storrs v. Municipality of Anchorage*, 721 P.2d 1146, 1150 (Alaska 1986) (providing collective bargaining agreement may alter covered employees' pre-termination rights in limited circumstances); *Antinore v. State*, 371 N.Y.S.2d 213, 217 (N.Y. App. Div. 1975) (finding collective bargaining agreements made by "a reciprocal negotiation between forces with strengths on both sides, reflecting the reconciled interests of employer and employees, voluntarily entered into" can waive due process rights).

[8]        *Lynden Transp. v. State*, 532 P.2d 700, 717 (Alaska 1975).

[9]        *Bowen v. N.C. Dep't of Human Res.*, 710 F.2d 1015, 1018 (4th Cir. 1983).

[10]        *Antinore*, 371 N.Y.S.2d at 217.

requirement of abiding by the hospital's policy to obtain privileges is more akin to a contract of adhesion.

Providence cites *Whitaker v. Houston County Hospital Authority* to support its proposition that a doctor can waive the right to a pre-termination hearing and, if waived, the automatic termination of hospital privileges would not violate the doctor's due process right.[11] But in *Whitaker* the doctor "expressly waive[d] any procedural due process rights" through a contract entered into directly with the hospital.[12] Here neither Providence policy MS 980-150 nor the document Dr. Brandner signed for his 2009 reinstatement at the hospital specifically mentioned waiving due process rights. Thus there is no evidence of a "conspicuous and unequivocal" intent by Dr. Brandner to waive his right to a pre-termination hearing. The superior court rejected Providence's waiver argument, finding "no language in [Dr. Brandner's application for privileges] referencing a general right to due process or dealing specifically with a physician's right to . . . a pre-termination hearing in professional review actions."

Like the superior court, we conclude that Dr. Brandner did not knowingly and clearly waive his due process rights merely by signing his reappointment application for hospital privileges. Thus Dr. Brandner maintained a protected property interest in his hospital privileges subject to due process if terminated.

---

[11]    613 S.E.2d 664, 671-72 (Ga. App. 2005).

[12]    *Id.* at 667.

### 2. Due process required that Dr. Brandner receive an opportunity to be heard prior to the termination of his hospital privileges.

Dr. Brandner contends that due process requires a hearing before deprivation of a constitutionally protected property interest in employment.[13] "We have consistently held that before the state may deprive a person of a protected property interest there must be a hearing . . . ."[14] The only exceptions to this pre-termination hearing requirement are in emergency situations or when "public health, safety, or welfare require[s] summary action."[15] Other courts have agreed that medical staff privileges are a valuable property interest and that notice and hearing should precede termination of these privileges absent an "extraordinary situation where a valid government or medical interest is at stake."[16]

Providence argues that Dr. Brandner was not entitled to a pre-termination hearing because the Providence policy contains explicit language that a violation of MS 980-150(D) results in "an automatic termination" and because of "Providence's compelling interest" in ensuring patient safety and the highest quality in medical care. Providence contends that Dr. Brandner received all the process to which he was entitled because: (1) he had full and fair opportunity to make his arguments to a neutral hearing panel; (2) he had full and fair opportunity to appeal the hearing panel recommendation

---

[13] *See City of N. Pole v. Zabek*, 934 P.2d 1292, 1297 (Alaska 1997).

[14] *Graham v. State*, 633 P.2d 211, 216 (Alaska 1981) (first citing *Etheredge v. Bradley*, 502 P.2d 146 (Alaska 1972); then citing *Frontier Saloon, Inc. v. Alcoholic Beverage Control Bd.*, 524 P.2d 657 (Alaska 1974)).

[15] *Id.* (quoting *Frontier Saloon*, 524 P.2d at 661).

[16] *Ne. Ga. Radiological Assocs., P.C. v. Tidwell*, 670 F.2d 507, 511 (5th Cir. Unit B 1982); *accord Shahewy v. Harrison*, 875 F.2d 1529, 1533-34 (11th Cir. 1989); *Osuagwu v. Gila Reg'l Med. Ctr.*, 850 F. Supp. 2d 1216, 1223 (D.N.M. 2012).

to a separate, neutral review committee and to the Providence Board, and both upheld the hearing panel's decision; and (3) Providence followed the policies and procedures Dr. Brandner had agreed to abide by. But Providence's procedures *after* terminating a doctor's privileges do not remedy its failure to provide procedures *before* termination.

We previously confirmed the importance of a hearing before suspending or terminating a doctor's staff privileges because summary action amounts to "a stigma of medical incompetence" affecting the doctor's ability to maintain income and reputation, both during the period between the deprivation of privileges and a hearing as well as after the hearing.[17] This stigma is compounded because federal law now requires that all terminations be reported to a national data bank.[18] Acknowledging the competing interests between a doctor's capacity to maintain employment and a health care entity's interest in maintaining safe and high quality patient care, we have previously held that terminating hospital privileges before a hearing is "justified only where there is evidence that a physician's conduct poses a realistic or recognizable threat to patient care which would require immediate action by the hospital."[19]

Providence contends that Dr. Brandner's deceitfulness posed a realistic or recognizable threat to patient care; when a physician is dishonest and actively conceals licensing conditions, a hospital cannot address the undisclosed problems because it "simply does not know what it does not know" and thus cannot assess whether there might be a "realistic and recognizable threat" to patient care. Providence maintains, as a patient safety matter, that physicians must comply with Providence's self-reporting policy and that failure to do so is "cause for deep concern."

---

[17] *McMillan v. Anchorage Cmty. Hosp.*, 646 P.2d 857, 864 (Alaska 1982).

[18] 42 U.S.C. §§ 11133, 11136; 45 C.F.R. § 60.1 (2013).

[19] *McMillan*, 646 P.2d at 866.

Providence has a policy expressly authorizing an immediately effective "precautionary suspension" when a doctor presents an imminent danger to the health or safety of an individual or to the hospital's orderly operations, but this was not the policy followed when terminating Dr. Brandner's privileges.[20] As Pakney noted at the November 2011 hearing, there was no precautionary suspension because there was no determination that Dr. Brandner was an imminent danger to health or public safety. The executive committee was aware that the Menninger Clinic had evaluated Dr. Brandner and found he was fit to practice. Although this evaluation might not have considered other factors bearing on whether Dr. Brandner was an imminent threat to patient care, it is relevant to whether Providence actually terminated Dr. Brandner because it found that he posed a threat to patient care. And the June 17, 2011 letter notifying Dr. Brandner of the executive committee's recommendation that his privileges be terminated made no mention of patient safety concerns.

It is possible, as Providence argues, that a physician's dishonesty might in some circumstances be sufficient cause for emergency termination. But here this speculative possibility — raised as a post hoc rationalization rather than a demonstrated contemporaneous concern in Dr. Brandner's case — does not rise to the level of a "realistic or recognizable threat" requiring an emergency termination of hospital privileges. We therefore disagree with the superior court's determination that the connection between Dr. Brandner's "dishonesty" and patient safety was sufficient to override Dr. Brandner's due process right, and we conclude that Providence violated Dr. Brandner's right to due process by terminating his hospital privileges without a pre-termination opportunity to be heard.

---

[20]     *Cf.* 42 U.S.C. § 11112(c)(2) (providing HCQIA immunity safe harbors for action taken to prevent "imminent danger to the health of any individual," subject to post-suspension notice and hearing protections).

**B.** **Dr. Brandner's Substantive Due Process Rights Were Not Violated Through Arbitrary And Capricious Application Of An Ambiguous Hospital Policy.**

Dr. Brandner further claims that his substantive due process rights were violated because Providence policy MS 980-150(D) is vague and ambiguous, and that Providence terminated his privileges in an arbitrary and capricious manner without regard to his reasonable policy interpretation or to whether terminating his hospital privileges was commensurate with the harm caused by breaching the policy.

Although we do not interfere with hospital policy determining the medical training and experience necessary to qualify for hospital privileges, courts may determine whether a hospital has followed its own policies and whether a decision regarding hospital privileges was made in accordance with basic principles of fairness and due process of law.[21] These principles require that: (1) the procedures employed are fair; (2) the standards are reasonable; and (3) the standards have not been applied in an arbitrary and capricious manner.[22] Due process further requires that "criteria established for granting or denying privileges not be vague and ambiguous, and that as established, they be applied objectively."[23] "A statute, rule, or policy may be deemed impermissibly vague for either of two discrete reasons: It fails to provide people of ordinary intelligence a reasonable opportunity or fair notice to understand what conduct it prohibits; or, it authorizes or encourages arbitrary and discriminatory enforcement."[24] Accordingly the inquiry before us is not whose policy interpretation is more reasonable,

---

[21] *Kiester v. Humana Hosp. Alaska, Inc.*, 843 P.2d 1219, 1223 (Alaska 1992).

[22] *Id.*

[23] *Id.* at 1225.

[24] *Roberts v. Titus Cty. Mem'l Hosp.*, 129 Fed. Appx. 82, 86 (5th Cir. 2005) (citing *Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)).

but whether the policy itself is so vague or ambiguous that it is susceptible to an arbitrary and capricious application.

### 1. The policy's application was clear.

The superior court concluded that Providence policy MS 980-150 is "clear enough." Dr. Brandner nonetheless contends that he found it ambiguous because its key terms could be interpreted differently by reference to state law. MS 980-150's operative provision requires doctors to report to Providence "any limitations, restrictions, or conditions of any sort imposed by a state board, health care entity or agency with respect to the practitioner's practice." Dr. Brandner argues that state law does not construe the State Board's order as a "disciplinary action" or a "condition," because such actions would have required that the State Board hold a hearing and none occurred in his case.[25] Thus Dr. Brandner argues that under state law his practice was never limited in any way and that he cannot be faulted for his interpretation, especially when the State Board investigator had confirmed in his case's proceedings that his license "was not conditioned, limited, or restricted by the [State] Board."

Surviving a vagueness challenge requires "fair notice" of what is and what is not prohibited.[26] And here the superior court found that Dr. Brandner had more than

---

[25]   *See* AS 08.64.326(a) (requiring a hearing before imposing sanctions); AS 08.64.331(a)(6) (describing sanctions State Board may impose, including "limitations or conditions on the practice of a licensee"). Dr. Brandner's argument rests on the theory that Providence must interpret the word "conditions" in MS 980-150 exactly, and only, as the word is used by the State Board in AS 08.64.331(a). We find this argument unpersuasive — "limitations" and "conditions" do not necessarily have the same meaning under MS 980-150, a Providence hospital policy, as they do under AS 08.64.331(a)(6), a statute setting out State Board procedures. And the hospital policy does not mention the statute.

[26]   *Roberts*, 129 Fed. Appx. at 86; *see Gottschalk v. State*, 575 P.2d 289, 290
(continued...)

"fair notice" of what MS 980-150 required; it found he had actual knowledge that the policy required him to report the conditions the State Board placed on his license. The superior court found that Dr. Brandner knew the self-reporting policy applied to his circumstances and knew he had an obligation to report the conditions placed on his license, and thus he knowingly violated the policy. Dr. Brandner does not challenge that finding. We therefore affirm the superior court's determination that the policy's application was clear to Dr. Brandner.

## 2. The policy was not applied arbitrarily or capriciously.[27]

When concerns are raised about a hospital policy giving enforcing authorities excessive discretion, the policy should not be found impermissibly vague absent evidence that it has been arbitrarily applied.[28] And on the facts of this case, the hospital policy was not arbitrarily or capriciously applied. Dr. Brandner suggests that the ambiguity of the policy allowed Providence to enforce it in an arbitrary and capricious manner. As evidence that Providence had impermissibly broadened the scope of the policy and enforced it in an arbitrary and capricious manner, he points to testimony before the hearing panel from an executive committee member who took the view that the policy required reporting "investigations." Dr. Brandner's argument has no merit. The executive committee member's testimony did not persuade the hearing

---

[26]      (...continued)
(Alaska 1978).

[27]      *See Roberts*, 129 Fed. Appx. at 86 (holding a rule may be deemed impermissibly vague if "it authorizes or encourages arbitrary and discriminatory enforcement" (citing *Chicago v. Morales*, 527 U.S. 41, 56-57(1999))); *see also Morales*, 527 U.S. at 60 (defining an arbitrary and discriminatory application as one that "necessarily entrusts lawmaking to the moment-to-moment judgment" of the enforcer).

[28]      *See Stock v. State*, 526 P.2d 3, 8, 12 (Alaska 1974).

panel to conclude that investigations, as well as limitations, restrictions, and conditions, must be reported. The hearing panel in fact concluded that Dr. Brandner's hospital privileges were terminated because of his failure to report a "condition" the State Board imposed on his license, not because of his failure to report an investigation.

Dr. Brandner also points to the superior court's consideration of his other conduct violations as evidence that MS 980-150 is ambiguous about what constitutes a "condition," arguing that the policy's fundamental ambiguity allowed it to be applied arbitrarily. Specifically, Dr. Brandner argues that it was improper for the superior court to consider the fact that he signed up for emergency call duty when he was restricted from doing so. But the superior court stated that Dr. Brandner's alleged misconduct was *not* the basis for the Providence executive committee's recommendation to terminate his privileges and that the hearing panel gave the misconduct evidence "no weight" in upholding the decision. We therefore affirm the superior court's determination that the policy was not applied arbitrarily or capriciously.

### 3.     There is no history of arbitrary and capricious application.

In the context of due process challenges to statutes and regulations, we will not invalidate a statute for vagueness absent "a history or pattern of arbitrary enforcement."[29] Although we do not need to consider whether this standard is applicable beyond that context, we nevertheless note that Dr. Brandner failed to identify a pattern of Providence arbitrarily enforcing MS 980-150. And the Providence review committee, in its letter to the Providence Board recommending review of the policy, wrote that the

---

[29]     *Storrs v. State Med. Bd.*, 664 P.2d 547, 552 (Alaska 1983) (refusing to invalidate a statute when the defendant physician could not identify any instances of arbitrary enforcement by the State Board); *see also Stock*, 526 P.2d at 12 ("While we may be able to conceive of instances in which the statute could be arbitrarily and capriciously enforced, we cannot on the basis of such mere hypothesis, in the absence of any history of actual arbitrary application, invalidate the statute.").

review committee had no reason to believe Providence had interpreted MS 980-150(D) differently for different physicians in the past or was likely to do so in the future.

### 4.    Summary

Because Providence policy MS 980-150 was not vague or ambiguous with respect to Dr. Brandner or on its face, and because it was not applied in an arbitrary and capricious manner to Dr. Brandner or historically, we cannot conclude that applying the policy in terminating Dr. Brandner's hospital privileges violated his substantive due process rights.   Dr. Brandner therefore is not entitled to reinstatement or post-termination-hearing damages.

### C.    Providence Does Not Qualify For HCQIA Immunity With Respect To The Termination Of Dr. Brandner's Privileges Without An Opportunity To Be Heard.

Congress enacted HCQIA to improve the quality of health care and reduce the number of incompetent physicians.[30]  Congress determined that both goals could be attained through "effective professional peer review."[31]  Accordingly HCQIA eliminates some deterrents to effective professional peer review of physician competence by providing immunity from damages to "professional review bodies" and individuals acting in support of those bodies.[32]  Immunity under the act covers only liability for

---

[30]    *See* 42 U.S.C. § 11101.

[31]    *Id.*

[32]    *See id.* § 11111(a)(1)-(2); *see also* 42 U.S.C. § 11151(11) (defining "professional review body" as "health care entity"), § 11151(4)(A) (defining "health care entity" as licensed hospital); *Decker v. IHC Hosps., Inc.*, 982 F.2d 433, 436 (10th Cir. 1992) (exploring scope of immunity provided by § 11111(a)).

damages; it does not shield covered defendants from lawsuit or from other forms of relief.[33]

For HCQIA to immunize Providence from damages resulting from a professional review action, the hospital must satisfy all four elements set forth in 42 U.S.C. § 11112(a), providing:

> For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken —
>
>> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>>
>> (2) after a reasonable effort to obtain the facts of the matter,
>>
>> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>>
>> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
>
> A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.[34]

Federal courts have granted hospitals immunity under the Act when they clearly establish that "a full and fair peer review process was used" in connection with denying hospital

---

[33]     42 U.S.C. § 11111(a)(1) (specifying immunity from damages only and not mentioning other relief); *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 35 (1st Cir. 2002).

[34]     42 U.S.C. § 11112(a).

privileges to a physician.[35]   Under HCQIA "a professional review body (including a hospital), its members, its staff, and others under contract with it are immune from damages liability with respect to the body's actions."[36]   Here there is no dispute that Providence is a "health care entity" contemplated by HCQIA,[37] and its claim for protection arose from a peer review process for the purpose of furthering quality healthcare.   Dr. Brandner argues that Providence did not satisfy the notice and hearing prerequisite for immunity because he was not given a hearing prior to his termination.[38]

Dr. Brandner's rebuttal of Providence's HCQIA immunity presumption focuses on § 11112(a)(3), requiring that a professional review action be taken "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances." The superior court found Providence met § 11112(a)(3)'s requirement by providing Dr. Brandner "post-suspension, but pre-termination" fair hearing.   But Dr. Brandner contends Providence did not provide him "adequate notice and hearing procedures" *prior* to

---

[35]     *Ezekwo v. Am. Bd. of Internal Med.*, 18 F. Supp. 2d 271, 277 (S.D.N.Y. 1998), *aff'd* 174 F.3d 844 (2d Cir. 1999).

[36]     *Sobel v. United States*, 571 F. Supp. 2d 1222, 1229 (D. Kan. 2008); *see also Rodgers v. Columbia/HCA of Cent. La., Inc.*, 971 F. Supp. 229, 233 (W.D. La. 1997) (finding the hospital immune because it is a health care entity engaged in a professional review activity).

[37]     *See* 42 U.S.C. § 11151(4)(A)(ii) (using the term "health care entity" to describe an organization like Providence).

[38]     *See id.* § 11112(a)(3), (b).

terminating his hospital privileges, and thus HCQIA immunity cannot attach to Providence's initial termination action.[39]

---

[39]     In its petition for rehearing Providence argues that the superior court made a factual finding that Dr. Brandner was not terminated in June 2011 but rather was only suspended pending the pre-termination fair hearing process. Providence argues that unless this unappealed finding is clearly erroneous, we must conclude that Dr. Brandner's privileges were not terminated until the Board affirmed the decision of the fair hearing appellate panel. It is not clear that there would be any difference in the due process and HCQIA analyses if Dr. Brandner's privileges had been suspended rather than terminated without an opportunity to be heard. *Cf. id.* § 11112(c)(1)(B) (providing HCQIA safe harbor for 14-day investigatory suspensions, thereby implicitly contemplating immunity might not attach for longer suspensions). Regardless, we conclude that any such putative finding by the superior court is clearly erroneous. *See Baker v. Ryan Air, Inc.*, 345 P.3d 101, 106 (Alaska 2015) ("We review factual findings for clear error . . . . 'A factual finding is clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are definitely and firmly convinced that the finding is mistaken.' " (footnote omitted) (quoting *Simone H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 284, 288 (Alaska 2014))).

    The policy Providence relied upon calls for the automatic termination of privileges, not suspension; as discussed earlier Providence did not rely on its policy calling for an immediate "precautionary suspension" of privileges for patient safety concerns. At the November fair hearing Providence's counsel told the hearing panel that in June 2011 the executive committee had recommended "that [Dr. Brandner's] privileges were to be automatically terminated" and that in June 2011 the Providence Board "affirmed" that recommendation. Pakney then testified at the hearing exactly as Providence's counsel had described the sequence of events. The fair hearing panel then stated the same sequence of events in its written decision and concluded that the prior decision to automatically terminate Dr. Brandner's privileges under the Providence policy was "not arbitrary, capricious, or unsupported by substantial evidence." The fair hearing appellate panel similarly stated that the executive committee had concluded that "automatic termination" of Dr. Brandner's privileges was warranted and the Board "affirmed" the executive committee's recommendation, and, after considering the fair hearing panel's report, recommended that the executive committee recommendation be confirmed by the Board. Providence points to no part of the record for the fair hearing process reflecting an argument or position by Providence that Dr. Brandner's privileges

(continued...)

Providence claims that prior to its terminating Dr. Brandner's hospital privileges he had waived his right to notice and hearing because he had agreed to be bound by hospital bylaws and policies. But waivers cannot release a hospital from HCQIA requirements to achieve immunity. A Colorado Court of Appeals case is instructive. In *Peper v. St. Mary's Hospital & Medical Center* a hospital took final action adverse to a doctor without providing notice that his conduct was under review.[40] The hospital gave "no opportunity to be heard before revoking his privileges and reporting him to the state medical board and the national data bank," and it never claimed any health emergency requiring the immediate suspension of his privileges.[41] The hospital argued that because the doctor had agreed to be bound by its bylaws and because the bylaws did not provide for notice and hearing prior to a final decision, the hospital

---

[39]     (...continued)
had actually not been terminated in June 2011.

Moreover this argument is completely contrary to the main thrust of Providence's position in its briefing: that there was nothing wrong with automatically terminating Dr. Brandner's privileges in conformance with its policy and that the post-termination fair hearing process satisfied any due process concerns and entitled Providence to HCQIA immunity. Indeed, the headings and related arguments in Providence's brief regarding the due process issue all use a formulation that due process "did not require a pre-termination hearing." And Providence explicitly states in its brief that "Dr. Brandner's privileges were terminated subject to his right to fully participate in the Fair Hearing process," Dr. Brandner "was not entitled to a pre-termination hearing given the explicit language of MS 980-150," and the result of the fair hearing process was to "affirm[] the application of MS 980-150's automatic sanction." We therefore reject this new argument in Providence's petition for rehearing.

[40]     207 P.3d 881, 888 (Colo. App. 2008).

[41]     *Id.*

had adequately met HCQIA's notice and hearing requirement.[42] But the court disagreed, holding that a hospital's compliance with its bylaws may nonetheless be insufficient as a matter of law to meet HCQIA immunity requirements.[43] The court concluded that immunity attaches when the professional review action satisfies HCQIA requirements, regardless of the hospital's own procedures,[44] and that signing hospital bylaws did not waive the doctor's right to adequate notice and hearing under HCQIA statutory provisions.[45] The court concluded that the hospital failed to provide the doctor adequate notice and hearing under § 11112(a)(3), and thus it denied the hospital HCQIA immunity from the doctor's claims.[46]

The facts here are similar. Providence did not provide notice and hearing to Dr. Brandner before the executive committee considered and recommended terminating his hospital privileges at its June 13, 2011 committee meeting. Although on June 17 Providence gave Dr. Brandner notice of the executive committee's recommendation and of his right to a hearing, the Providence Board affirmed the executive committee's recommendations a few days later without giving Dr. Brandner any opportunity to be heard. And although appeal hearings took place after the actual termination of Dr. Brandner's privileges, these procedures are insufficient to satisfy § 11112(a)(3)'s requirement that adequate hearing procedures must be afforded to the physician *before* the professional review action is taken. Providence could have

---

[42] *Id.* at 884, 888.

[43] *Id.* at 888.

[44] *Id.* at 889.

[45] *Id.* at 888.

[46] *Id.* at 886-89.

provided some kind of opportunity for Dr. Brandner to be heard between June 17 and the Providence Board's affirmation of the termination recommendation a few days later, but it did not.

Providence asserts that it nevertheless met § 11112(a)(3)'s requirements because Dr. Brandner was afforded "other procedures as are fair" under the circumstances when he received a hearing and an appeal after the termination of his privileges. But HCQIA specifies that a professional review action must be taken "*after* such other procedures as are fair to the physician under the circumstances."[47] The professional review action at issue is the June termination of Dr. Brandner's hospital privileges. This action took place *before* the November hearing panel and the later appellate review committee proceedings. As in *Peper*, Dr. Brandner did not waive his right to the adequate notice and hearing required under HCQIA.[48] Thus the hearing and the appeal provided after the termination cannot under the facts of this case be construed as "other . . . fair" procedures satisfying § 11112(a)(3)'s notice and hearing requirement. Accordingly, Dr. Brandner rebutted the presumption that this element of the four statutory requirements was met.

In its petition for rehearing Providence argues for the first time that it is entitled to HCQIA immunity for its failure to provide Dr. Brandner a pre-termination opportunity to be heard based on § 11112(b)'s[49] "safe harbor" provisions

---

[47] 42 U.S.C. § 11112(a)(3) (emphasis added).

[48] *See Peper*, 207 P.3d at 889.

[49] This section provides:

(b) Adequate notice and hearing

A health care entity is deemed to have met the

(continued...)

**49** (...continued)
adequate notice and hearing requirement of subsection (a)(3) [of this section] with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):

(1) Notice of proposed action

The physician has been given notice stating –

(A)(i) that a professional review action has been proposed to be taken against the physician,

(ii) reasons for the proposed action,

(B)(i) that the physician has the right to request a hearing on the proposed action,

(ii) any time limit (of not less than 30 days) within which to request such a hearing, and

(C) a summary of the rights in the hearing under paragraph (3).

(2) Notice of hearing

If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating –

(A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

(B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3) Conduct of hearing and notice

If a hearing is requested on a timely basis under paragraph (1)(B) –

(continued...)

-27-                                                7172

(...continued)

(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity) –

(i) before an arbitrator mutually acceptable to the physician and the health care entity,

(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

(iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

(C) in the hearing the physician involved has the right –

(i) to representation by an attorney or other person of the physician's choice,

(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

(iii) to call, examine, and cross-examine witnesses,

(iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

(v) to submit a written statement at the close of

(continued...)

(other than the waiver provision) and numerous federal court decisions Providence asserts have interpreted those provisions as allowing post-termination hearings to satisfy HCQIA. But Dr. Brandner does not argue that some sort of deficiency in Providence's fair hearing process precludes HCQIA immunity for Providence; Dr. Brandner argues that the failure to give him the slightest opportunity to be heard prior to terminating his privileges — as required by § 11112(a)(3) — precludes HCQIA immunity for Providence. The § 11112(b) safe harbor provisions do not appear to give Providence the protection it seeks. And the cases Providence cites do not support its position. The majority of those cases fall under the HCQIA safe harbor provisions for investigatory suspensions and actions taken to avoid "imminent danger to the health of any individual" contained in § 11112(c),[50] either explicitly or implicitly.[51]

---

[49]    (...continued)
        the hearing; and

        (D) upon completion of the hearing, the physician involved has the right –

        (i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

        (ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.

        A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) [of this section].

[50]    This section provides:

(continued...)

[50]     (...continued)

 (c) Adequate procedures in investigations or health emergencies

     For purposes of section 11111(a) of this title, nothing in this section shall be construed as –

     (1) requiring the procedures referred to in subsection (a)(3) of this section –

     (A) where there is no adverse profession review action taken, or

     (B) in the case of a suspension or restriction of clinical privileges, for a period of not longer than 14 days, during which an investigation is being conducted to determine the need for a professional review action; or

     (2) precluding an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual.

[51]     *See Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166, 169-70, 176 (4th Cir. 2009) (finding immunity where doctor had: (1) opportunity to present his case at executive meeting the same night he was summarily suspended in "the best interest of patient care and welfare"; (2) participated with counsel in a review hearing two months later where he presented argument, called witnesses, and presented evidence; and (3) a "full-blown" hearing on his appeal to the board five months later); *Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 836-37, 841-42 (3d Cir. 1999) (holding hospital had immunity under § 11112(c) where summary suspension of privileges was based on documented contemporaneous concern of imminent danger to patients); *Osuagwu v. Gila Reg'l Med. Ctr.*, 850 F. Supp. 2d 1216, 1229, 1238-39 (D. N.M. 2012) (finding pre-deprivation notice and hearing not necessary for duration of 14-day investigatory suspension, see § 11112(c)(1)(B), but no immunity for post-investigation extension of suspension absent committee "imminent danger" finding and adequate notice and hearing procedures); *Straznicky v. Desert Springs Hosp.*, 642 F. Supp. 2d 1238, 1248 (D. Nev. 2009) (finding immunity under § 11112(c) where committee "could reasonably
(continued...)

Two of the remaining cases are germane to the question whether a pre-deprivation hearing is necessary in non-emergency and non-investigatory situations.[52] In one the doctor already was on strict probationary status and the court found that under the circumstances the doctor had no expectation of a pre-termination opportunity to be

[51]     (...continued)
believe . . . the failure to summarily suspend [the doctor] could result in an imminent harm to the health of any individual," and immunity under § 11112(a) where doctor received adequate post-suspension procedure); *Bakare v. Pinnacle Health Hosps. Inc.*, 469 F. Supp. 2d 272, 282-83, 289-90 (M.D. Pa. 2006) (finding immunity under § 11112(c)(2) for "immediate, precautionary suspension" imposed "to protect the lives of patients and to reduce the substantial likelihood of immediate threat to the health and safety of patients," and immunity under § 11112(a)(3) where suspension was eased after initial review and vacated after "comprehensive and fair hearing"); *Sklaroff v. Allegheny Health Educ. Research Found.*, No. CIV.A 95-4758, 1996 WL 383137, at *9 (E.D. Pa. 1996) (finding immunity under § 11112(c) for summary suspension where committee concluded doctor "presented an immediate danger to patients admitted to his service," and immunity under § 11112(a)(3) where suspension was followed by notice of decision and hearing within 30 days at which doctor was represented by counsel, called and cross-examined witnesses, testified on own behalf, and presented evidence), *aff'd mem.*, 118 F.3d 1578 (3d Cir. 1997); *Fobbs v. Holy Cross Health Sys. Corp.*, 789 F. Supp. 1054, 1062-63, 1067-68 (E.D. Cal. 1992) (holding plaintiff forfeited right to a hearing by failing to attend without good cause), *rev'd on other grounds*, 29 F.3d 1439, 1442-43 (9th Cir. 1994) (holding summarily imposed monitoring restrictions were covered under § 11112(c) where "defendants had ample medical justification to take the steps" to "avoid imminent danger"), *overruled on other grounds by Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131, 1133 (9th Cir. 2001) (en banc).

[52]     *See generally Rogers v. Columbia/HCA of Cent. La., Inc.*, 971 F. Supp. 229 (W.D. La. 1997), *aff'd as mod.*, 140 F.3d 1038 (5th Cir. 1998); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599 (4th Cir. 2009), *aff'g* 453 F. Supp. 2d 942 (S.D. W. Va. 2006).

heard.[53]  In the other the doctor was afforded an opportunity to be heard during the course of the investigation, understood the process from previous experience, and had the opportunity to present his case at a committee meeting shortly after the suspension was imposed.[54]  The remaining cases Providence cites are simply not germane to the question whether a pre-termination hearing is necessary.[55]  Here Providence terminated

---

[53]     *See Rogers*, 971 F. Supp. at 235-37 (noting a "close question" whether pre-deprivation hearing is always required when exceptions provided in § 11112(c) do not apply, but holding hearing not required under the circumstances given probationary status where for "ten months [doctor] was monitored and corrected" and "knew what was at stake, but . . . conduct did not improve").

[54]     *See Wahi*, 562 F.3d at 610-14 (holding pre-suspension hearing not necessary under the circumstances when:  (1) suspension was instituted only shortly before doctor had opportunity to present case at committee meeting; (2) doctor had earlier been informed of investigation and provided opportunity to respond in writing; (3) "allegations were simply the latest in [the doctor's] tumultuous history," which included three prior suspensions; and (4) hospital diligently worked to arrange acceptable post-decision hearing but doctor "seemed more intent on forestalling a hearing than having one").

[55]     *See Wieters v. Roper Hosp., Inc.*, 58 Fed. App'x 40, 42-43, 45-46 (4th Cir. 2003) (finding immunity where doctor received pre-probation hearing but no post-probation hearing because the latter was replaced by an evidentiary hearing for summary suspension that was imposed "in response to new disruptive incidents"); *Gabaldoni v. Wash. Cty. Hosp. Ass'n*, 250 F.3d 255, 262 (4th Cir. 2001) ("[T]he 'professional review action' occurred when the Board took the action . . . to terminate [the doctor's] clinical privileges and deny his application for reappointment, which indisputably occurred after the requisite notice and hearing procedures were followed."); *Smith v. Ricks*, 31 F.3d 1478, 1485 n.5 (9th Cir. 1994) (noting § 11112(b) safe harbors are sufficient but not necessary to obtain HCQIA immunity); *Egan v. Athol Mem'l Hosp.*, 971 F. Supp. 37, 40-41, 43-44 (D. Mass. 1997) (finding sufficient procedure where, following years of complaints that doctor had responded to both orally and in writing:  (1) hospital recommended conditional reappointment and provided opportunity for hearing; (2) doctor waived right to hearing by failing to timely respond; and (3) privileges were

(continued...)

Dr. Brandner's privileges in a non-emergency setting without any kind of opportunity to be heard despite having the time and ability to give Dr. Brandner that opportunity. Providence's belated reliance on the safe harbor provisions of § 11112(b) is without merit, and § 11112(c) similarly fails to support Providence's position.

We therefore reverse the superior court's conclusion that HCQIA immunity applies to the due process violation arising from terminating Dr. Brandner's hospital privileges without an opportunity to be heard.[56] We remand for further proceedings on Dr. Brandner's claim for damages with respect to this due process violation.[57]

## V. CONCLUSION

We AFFIRM the superior court's termination claim decision; we REVERSE the pre-termination hearing claim decision and REMAND to the superior court for further proceedings consistent with this decision.

---

[55] (...continued)
terminated after doctor failed to complete mandated conditions), *aff'd*, 134 F.3d 361 (1st Cir. 1998); *Mathews v. Lancaster Gen. Hosp.*, 883 F. Supp. 1016, 1034 (E.D. Pa. 1995) (finding immunity applied where proposed restrictions had been suspended pending outcome of hearing, proposed action followed a lengthy investigation in which doctor participated, and doctor filed suit before hearing was scheduled), *aff'd*, 87 F.3d 624, 637-38 (3d Cir. 1996).

[56] Because of this decision we do not need to address other HCQIA issues Dr. Brandner raised on appeal.

[57] *See City of N. Pole v. Zabek*, 934 P.2d 1292, 1299 (Alaska 1997) (awarding damages for period between wrongful termination and curative post-termination hearing).

# In the Supreme Court of the State of Alaska

Michael D. Brandner, M.D., )
                                ) Supreme Court No. S-15933

            Appellant, )

                                ) **ORDER**

       v. ) Withdraw and Reissue Opinion

                                )

Providence Health & Services, ) **Date of Order**:  May 19, 2017
— Washington, )

                                )

                  Appellee. )

Superior Court No. 3AN-13-07697 CI

> Before:      Stowers, Chief Justice, Winfree and Bolger, Justices.  [Fabe and Maassen, Justices, not participating.]

Having considered Providence Health & Services — Washington's Petition for Rehearing and Dr. Brandner's response,

**IT IS ORDERED** that the Petition for Rehearing is **GRANTED**, and:

1.      Opinion No. 7135 issued on November 25, 2016, is **WITHDRAWN**.

2.      Opinion No. 7172 is issued on May 19, 2017, in its place.

Entered by direction of the court.

                           Clerk of the Appellate Courts

                                 /s/

                           _____
                           Marilyn May

cc:     Supreme Court Justices
        Judge Patrick McKay
        Trial Court Appeals Clerk
        Publishers

Distribution:

Richard W Maki                         Peter Scully
David H Shoup                        Robert J Dickson
Tindall Bennett & Shoup PC       Atkinson Conway & Gagnon
508 W 2nd Ave 3rd Floor           420 L St., Ste 500
Anchorage AK 99501               Anchorage AK 99501